328 F.3d 466
 Michael A. NEWDOW, Plaintiff-Appellant,
v.
U.S. CONGRESS; United States of America; George W. Bush,* President of the United States; State of California; Elk Grove Unified School District; David W. Gordon, Superintendent EGUSD; Sacramento City Unified School District; Jim Sweeney, Superintendent SCUSD, Defendants-Appellees.
 No. 00-16423.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 14, 2002.
 Filed June 26, 2002.
 Amended February 28, 2003.
 
 COPYRIGHT MATERIAL OMITTED Michael Newdow, Sacramento, California, pro se.
 Kristin S. Door, Assistant United States Attorney, Sacramento, California, Lowell V. Sturgill, Jr., Department of Justice, Washington, D.C., for federal government defendants-appellees; A. Irving Scott, Terence J. Cassidy, Porter, Scott, Weiberg & Delehant, Sacramento, California, for school district defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California; Milton L. Schwartz, Senior Judge, Presiding. D.C. No. CV 00-00495-MLS/PAN.
 Before: GOODWIN, REINHARDT and FERNANDEZ, Circuit Judges.
 
 
 1
 Opinion by Judge GOODWIN; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.
 
 ORDER
 
 2
 The opinion filed June 26, 2002 [292 F.3d 597**], is ordered amended. The Clerk is instructed to file the amended opinion with Judge Fernandez's amended concurrence/dissent. Judge Reinhardt's concurrence in the order denying rehearing en banc, along with Judge O'Scannlain's and Judge McKeown's dissent from that order shall also be filed.
 
 
 3
 The Clerk is also instructed not to accept for filing any new petitions for rehearing and petitions for rehearing en banc in this case.
 
 
 4
 With the opinion thus amended, the panel has voted unanimously to deny the petitions for rehearing.
 
 
 5
 The full court has been advised of the petitions for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35.
 
 
 6
 The petitions for rehearing are DENIED and the petitions for rehearing en banc are DENIED.
 
 
 7
 REINHARDT, Circuit Judge, concurring in the order.
 
 
 8
 My views as to the merits of this issue are set forth in the amended majority opinion authored by Judge Goodwin, and I adhere to them fully. I write separately for two reasons unrelated to the contents of that opinion. I write first to comment on the separate dissent to the denial of rehearing en banc authored by Judge McKeown and joined in by Judges Hawkins, Thomas, and Rawlinson, in which my colleagues appear to express the view that a case should be reheard en banc whenever it involves "a question of exceptional importance." FED. R. APP. P. 35(a)(2).[1] Second, I am compelled to register my strong disagreement with one particularly unfortunate aspect of Judge O'Scannlain's principal dissent that reflects a serious misconception of fundamental constitutional principles and the proper role of the federal judiciary.
 
 
 9
 * As to the first question, I disagree with the notion that the importance of an issue is a sufficient reason to take a case en banc, either under the Rule or as a matter of judicial policy. Rule 35(a) advises this court of its discretionary power to order that a case already decided by a three-judge panel be reheard by the full court. Specifically, the rule begins by stating that a "majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals en banc." FED. R. APP. P. 35(a) (emphasis added). Subsection two guides such discretionary consideration by stating that one compelling reason to grant rehearing en banc is the "exceptional importance" of a particular case.
 
 
 10
 The most reasonable construction of the Rule is that this court should rehear a case en banc when it is both of exceptional importance and the decision requires correction. See United States v. Burdeau, 180 F.3d 1091, 1092 (9th Cir.1999) (Tashima, J., concurring in the order denying rehearing en banc) ("Subject to rare exceptions,... we should review the statements in three[-]judge panel opinions only to `determine whether the [panel's] legal error resulted in an erroneous judgment.....'") (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). A decision may warrant correction because a three-judge panel has reached a result or adopted a legal rule or principle that conflicts with our existing circuit law or that the majority of our court believes is incorrect and needs further review. The fact that three-judge panels often decide cases of exceptional importance, whether it be the constitutionality of a state's decision to execute an individual who may be innocent, the existence or non-existence of a fundamental right, or the ability of the Congress to require the states to comply with federal law — an issue that some of us thought had been settled by the successful end to the Civil War — is an unremarkable, but undeniably important, aspect of our appellate system. See Tracey E. George, The Dynamics and Determinants of the Decision to Grant En Banc Review, 74 WASH. L. REV. 213, 218 (1999) (stating that three-judge panels "representing and acting on behalf of the whole court" is a "basic tenet of our intermediate appellate system"). Unless reconsidered en banc, a decision of a three-judge panel is a decision of our court and speaks for our court. Moreover, it ordinarily constitutes the final judicial decision.[2]
 
 
 11
 To rehear a case en banc simply on the basis that it involves an important issue would undermine the three-judge panel system and create an impractical and crushing burden on what otherwise should be, as Rule 35(a) suggests, an exceptional occurrence. See FED. R. APP. P. 35(a) ("An en banc hearing or rehearing is not favored...."). According to statistics kept by the Clerk of the court, in 2002 this court decided 5,190 cases on the merits, more than 98% of which were finally decided by three-judge panels. These decisions are not measures of "rough justice," later to be refined by the en banc court. Unless they decide issues of exceptional importance erroneously, create a direct intra-circuit split, or unless the interests of justice require that the decision be corrected, the opinions of three-judge panels should constitute the final action of this court.
 
 II
 
 12
 I also feel compelled to discuss a disturbingly wrongheaded approach to constitutional law manifested in the dissent authored by Judge O'Scannlain. The dissent suggests that this court should be able to conclude that the panel's holding was erroneous by observing the "public and political reaction" to its decision. Dissent at 2783. This is not the first time that the magnitude of the political response regarding an issue has distracted certain members of this court. An equally disturbing misunderstanding of the nature of our Constitution and the role of the federal judiciary was manifested in Coalition for Econ. Equity v. Wilson, 122 F.3d 692 (9th Cir.1997), a case involving a California initiative on the subject of affirmative action. There, the three-judge panel, in a case that unfortunately was not taken en banc, notwithstanding its exceptional importance, made the following remarkable statement: "A system which permits one judge to block with the stroke of a pen what 4,736,180 state residents voted to enact as law tests the integrity of our constitutional democracy." Id. at 699 (O'Scannlain, J.).
 
 
 13
 The Bill of Rights is, of course, intended to protect the rights of those in the minority against the temporary passions of a majority which might wish to limit their freedoms or liberties. As Justice Jackson recognized:
 
 
 14
 The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.
 
 
 15
 W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). It is the highest calling of federal judges to invoke the Constitution to repudiate unlawful majoritarian actions and, when necessary, to strike down statutes that would infringe on fundamental rights, whether such statutes are adopted by legislatures or by popular vote. The constitutional system that vests such power in an independent judiciary does not "test[] the integrity of ... democracy." It makes democracy vital, and is one of our proudest heritages.
 
 
 16
 Moreover, Article III judges are by constitutional design insulated from the political pressures governing members of the other two branches of government. We are given life tenure and a secured salary so that, in our unique capacity to "say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60, 177 (1803), we may decide constitutional issues without regard to popular vote, political consequence, or the prospect of future career advancement.[3] Most federal judges do not question the wisdom of this approach. When the federal judiciary is so firmly separated by constitutional structure from the direct influence of politics, we must not undermine that structure by allowing political pressures, polls, or "focus groups" to influence our opinions, even indirectly.
 
 
 17
 This is not to say that federal judges should be completely sequestered from the attitudes of the nation we serve, even though our service is accomplished not through channeling popular sentiment but through strict adherence to established constitutional principles. The Constitution contemplates occasions when we must be responsive to long-term societal trends — when determining, for example, that which is "cruel and unusual," see Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), whether in the execution of the mentally retarded, see Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 2247, 153 L.Ed.2d 335 (2002), or the execution of juvenile offenders, see In re Stanford, ___ U.S. ___, 123 S.Ct. 472, 474, 154 L.Ed.2d 364 (2002) (Stevens, J., dissenting from the denial of an application for an original writ of habeas corpus). This broader long-term social conscience, however, is a matter far different from responding to particular immediate political pressures. We may not — we must not — allow public sentiment or outcry to guide our decisions. It is particularly important that we understand the nature of our obligations and the strength of our constitutional principles in times of national crisis; it is then that our freedoms and our liberties are in the greatest peril. Any suggestion, whenever or wherever made, that federal judges should be encouraged by the approval of the majority or deterred by popular disfavor is fundamentally inconsistent with the Constitution and must be firmly rejected.
 
 
 
 Notes:
 
 
 *
 George W. Bush is substituted for his predecessor, William Jefferson Clinton, as President of the United States. Fed. R.App. P. 43(c)(2)
 
 
 **
 See amended opinion by Judge Goodwin infra
 
 
 [1]
 While the brief separate dissent is deliberately opaque and uninformative, I would suspect that not all of its signatories believe that the general rule they appear to advocate should apply regardless of the "correctness" of the panel opinion. The concept that "exceptional importance" is, without more, a sufficient reason for en banc review is, however, shared by at least several members of the Court and accordingly merits some discussion
 
 
 [2]
 While the Supreme Court unquestionably has the authority to review any or all of the decisions of the Court of Appeals, the Court has elected to hear a remarkably small number of cases in recent years. For example, in the 2001 term, of the 7,852 case filings, the Court heard argument in 88 cases, and disposed of 85 in 76 signed opinionsSee Supreme Court of the United States, 2002 Year-End Report on the Federal Judiciary, at http://www.supremecourtus.gov/publicinfo/year-end/2002year-endreport.html.
 
 
 [3]
 Alexander Hamilton was admirably cognizant of the danger of relying on temporary political whimsy:
 This independence of the judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humors which the arts of designing men, or the influence of particular conjectures, sometimes disseminate among the people themselves, and which, though they speedily give place to better information, and more deliberate reflection, have a tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.
 THE FEDERALIST NO. 78, at 437 (Alexander Hamilton) (Clinton Rossiter ed., 1999).
 
 
 
 18
 O'SCANNLAIN, Circuit Judge, with whom KLEINFELD, GOULD, TALLMAN, RAWLINSON, and CLIFTON, Circuit Judges, join, dissenting from the denial of rehearing en banc.
 
 
 19
 Last June, a two-judge majority of a three-judge panel of this court ruled that the Pledge of Allegiance was unconstitutional simply because of the presence of two offending words: "under God." It was an exercise in judicial legerdemain which, not surprisingly, produced a public outcry across the nation. Since that time we, as a court, have had the opportunity to order reconsideration of that decision en banc, yet a majority of the 24 active judges eligible to vote has decided not to do so. While there are, no doubt, varied and plausible reasons why this result occurred, I respectfully conclude that our court has made a serious mistake and thus must dissent from its order denying reconsideration.
 
 
 20
 * While I cannot say that a randomly selected 11-judge panel would have ruled differently, I believe that neither the June 2002 version, Newdow v. United States Congress, 292 F.3d 597 (9th Cir.2002) ("Newdow I"), nor today's slightly revised version, 328 F.3d 466 ("Newdow II") to essentially the same effect, is defensible. We should have reheard Newdow I en banc, not because it was controversial, but because it was wrong, very wrong — wrong because reciting the Pledge of Allegiance is simply not "a religious act" as the two-judge majority asserts, wrong as a matter of Supreme Court precedent properly understood, wrong because it set up a direct conflict with the law of another circuit, and wrong as a matter of common sense.[1] We should have given 11 judges a chance to determine whether the two-judge majority opinion truly reflects the law of the Ninth Circuit.[2] Reciting the Pledge of Allegiance cannot possibly be an "establishment of religion" under any reasonable interpretation of the Constitution.[3]
 
 
 21
 Perhaps in an effort to avoid ultimate Supreme Court review, Newdow II which replaces it, avoids expressly reaching the technical question of the constitutionality of the 1954 Act. Fundamentally, however, the amended decision is every bit as bold as its predecessor. It bans the voluntary recitation of the Pledge of Allegiance in the public schools of the nine western states thereby directly affecting over 9.6 million students,[4] necessarily implies that both an Act of Congress[5] and a California law[6] are unconstitutional, clearly conflicts with the Seventh Circuit's decision in Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Township, 980 F.2d 437 (7th Cir. 1992), and threatens cash-strapped school districts and underpaid teachers with the specter of civil actions for money damages pursuant to 42 U.S.C. § 1983.
 
 
 22
 Newdow I, the subject of our en banc vote, no longer exists; it was withdrawn after the en banc call failed. The panel majority has evolved to this extent: in Newdow I the Pledge was unconstitutional for everybody; in Newdow II the Pledge is only unconstitutional for public school children and teachers. The remainder of this dissent is directed entirely to Newdow II, which, as shall be demonstrated, differs little from Newdow I in its central holding. With grim insistence, the majority in Newdow II continues to stand by its original error — that voluntary recitation of the Pledge of Allegiance in public school violates the Establishment Clause because, according to the two-judge panel majority, it is "a religious act." Newdow II, 328 F.3d at 490. Common sense would seem to dictate otherwise, as the public and political reaction should by now have made clear. If reciting the Pledge is truly "a religious act" in violation of the Establishment Clause, then so is the recitation of the Constitution[7] itself, the Declaration of Independence,[8] the Gettysburg Address,[9] the National Motto,[10] or the singing of the National Anthem.[11] Such an assertion would make hypocrites out of the Founders, and would have the effect of driving any and all references to our religious heritage out of our schools, and eventually out of our public life.
 
 II
 
 23
 The Newdow II majority's primary legal argument is that the Supreme Court's decision in Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a school prayer case, controls the outcome of this case. In fact, rather than merely following Lee and its predecessors, the two-judge panel majority makes a radical departure from Lee and the cases it purports to apply. To understand why this is so, an examination of the Supreme Court's school prayer decisions which culminate in Lee is in order.
 
 
 24
 * 1
 
 
 25
 The fountainhead of all school prayer cases is Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In Engel the Court considered a school policy whereby children were directed to say aloud a prayer composed by state officials. The Court found that this practice was inconsistent with the Establishment Clause, reasoning that "[the] program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious." Id. at 424-25, 82 S.Ct. 1261. The Court concluded by stating that the state should leave prayer, "that purely religious function, to the people themselves." Id. at 435, 82 S.Ct. 1261. In a footnote, it reasoned as follows:
 
 
 26
 There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance.
 
 
 27
 Id. at 435 n. 21, 82 S.Ct. 1261. The Court drew an explicit distinction between patriotic invocations of God on the one hand, and prayer, an "unquestioned religious exercise," on the other. Concurring, Justice Douglas wrote that the narrow question presented was whether the state "oversteps the bounds when it finances a religious exercise." Id. at 439, 82 S.Ct. 1261 (Douglas, J., concurring). Justice Douglas noted that the Pledge of Allegiance, "like... prayer, recognizes the existence of a Supreme Being." Id. at 440 n. 5, 82 S.Ct. 1261. However, he noted that the House Report recommending the addition of the words "under God" to the Pledge stated that those words "in no way run contrary to the First Amendment but recognize `only the guidance of God in our national affairs.'" Id. (quoting H.R.Rep. No. 1693, 83d Cong., 2d Sess., p. 3).
 
 2
 
 28
 The following year, the Supreme Court decided Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In that case, the Court considered the constitutionality of a Pennsylvania statute requiring that "[a]t least ten verses from the Holy Bible shall be read, without comment, at the opening of each public school on each school day." Id. at 205, 83 S.Ct. 1560. The practice in public schools was for a teacher or student volunteer to read the required Bible verses each morning. This in turn was followed by a recitation of the Lord's prayer. Finally, the class would recite the Pledge of Allegiance to the Flag. Id. at 207-08, 83 S.Ct. 1560. The Court struck down the Bible reading and the practice of reciting the Lord's prayer as a state prescribed "religious ceremony," id. at 223, 83 S.Ct. 1560, but said nothing about the practice of reciting the Pledge.
 
 
 29
 As in Engel, the Court took pains to point to the character of the exercises it found wanting. The Court reasoned that "reading ... the verses ... possesses a devotional and religious character and constitutes in effect a religious observance. The devotional and religious nature of the morning exercises is made all the more apparent by the fact that the Bible reading is followed immediately by a recital in unison by the pupils of the Lord's prayer." Id. at 210, 83 S.Ct. 1560. "The pervading religious character of the ceremony," wrote Justice Clark, "cannot be gainsaid," and led to the conclusion that the exercises violated the Establishment Clause. Id. at 224, 83 S.Ct. 1560.
 
 
 30
 The concurring opinions in Schempp were all to the same effect. Justice Douglas agreed with the majority's conclusion that the practices at issue violated the Establishment Clause because "the State is conducting a religious exercise." Id. at 229, 83 S.Ct. 1560 (Douglas, J., concurring). In a lengthy concurrence, Justice Brennan wrote that "[t]he religious nature of the exercises here challenged seems plain." Id. at 266, 83 S.Ct. 1560 (Brennan, J., concurring). After surveying the history of devotional exercises in American public schools, Justice Brennan stated that "the panorama of history permits no other conclusion than that daily prayers and Bible readings in the public schools have always been designed to be, and have been regarded as, essentially religious exercises." Id. at 277-78, 83 S.Ct. 1560. For Justice Brennan, "religious exercises in the public schools present a unique problem" but "not every involvement of religion in public life violates the Establishment Clause." Id. at 294, 83 S.Ct. 1560. He warned that "[a]ny attempt to impose rigid limits upon the mention of God ... in the classroom would be fraught with dangers." Id. at 301, 83 S.Ct. 1560. Specifically, he wrote that "[t]he reference to divinity in the revised pledge of allegiance ... may merely recognize the historical fact that our Nation was believed to have been founded `under God.' Thus reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address, which contains an allusion to the same historical fact." Id. at 304, 83 S.Ct. 1560.
 
 
 31
 Justice Goldberg also wrote separately, stating that "the clearly religious practices presented in these cases are ... wholly compelling." Id. at 305, 83 S.Ct. 1560 (Goldberg, J., concurring). He reasoned that "[t]he pervasive religiosity and direct governmental involvement inhering in the prescription of prayer and Bible reading in the public schools... cannot realistically be termed simply accommodation." Id. at 307, 83 S.Ct. 1560. Like Justice Brennan, Justice Goldberg cautioned that the decision "does not mean that all incidents of government which import of the religious are therefore and without more banned by the strictures of the Establishment Clause." Id. at 307-08, 83 S.Ct. 1560. He then quoted in full the passage from Engel which drew a distinction between patriotic invocations of God, and unquestioned religious exercises that give rise to Establishment Clause violations. Id.
 
 3
 
 32
 The next case in this line is Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). That case considered the constitutionality of an Alabama statute authorizing a 1-minute period of silence in public schools "for meditation or voluntary prayer." Id. at 40, 105 S.Ct. 2479. The Court found that "[t]he wholly religious character" of the challenged law was "plainly evident from its text." Id. at 58, 105 S.Ct. 2479. The legislature's one and only purpose in enacting the law was "to return prayer to the public schools." Id. at 59-60, 105 S.Ct. 2479. Justice Powell's separate concurrence was "prompted by Alabama's persistence in attempting to institute state-sponsored prayer in the public schools." Id. at 62, 105 S.Ct. 2479 (Powell, J., concurring). Justice O'Connor wrote separately to suggest that moment-of-silence statutes were not "a religious exercise," and therefore were constitutional. Id. at 72, 105 S.Ct. 2479 (O'Connor, J., concurring). Justice O'Connor wrote further that "the words `under God' in the Pledge ... serve as an acknowledgment of religion with `the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future.'" Id. at 78 n. 5, 105 S.Ct. 2479 (quoting Lynch v. Donnelly, 465 U.S. 668, 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)) (alterations in original). In contrast, the Alabama statute at issue was very different from the Pledge—the state had "intentionally crossed the line [by] affirmatively endorsing the particular religious practice of prayer." Id. at 84, 105 S.Ct. 2479.
 
 4
 
 33
 Finally, there is the Supreme Court's decision in Lee v. Weisman. The issue presented was "whether including clerical members who offer prayers as part of the official school graduation ceremony" is consistent with the Establishment Clause. 505 U.S. at 580, 112 S.Ct. 2649. The graduating students entered as a group in a processional, after which "the students stood for the Pledge of Allegiance and remained standing during the rabbi's prayers." Id. at 583, 112 S.Ct. 2649. Justice Kennedy wrote that "the significance of the prayers lies ... at the heart of [the] case." Id. He framed the inquiry as follows:
 
 
 34
 These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.
 
 
 35
 Id. at 586, 112 S.Ct. 2649.
 
 
 36
 The Court in Lee concluded that Engel and its progeny controlled the outcome, writing that "[c]onducting this formal religious observance conflicts with settled rules pertaining to prayer exercises for students." Id. at 587, 112 S.Ct. 2649. As in Engel, Schempp, and Wallace, the crucial factor was the nature of the exercise in which the students were asked to participate. Time and again the Court went out of its way to stress the nature of the exercise, writing that prayer was "an overt religious exercise," id. at 588, 112 S.Ct. 2649, and that "prayer exercises in public schools carry a particular risk of indirect coercion." Id. at 592, 112 S.Ct. 2649. The practice was unconstitutional because "the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student." Id. at 598, 112 S.Ct. 2649. Just like the decisions in Engel and Schempp, the Court in Lee took pains to stress the confines of its holding, concluding that "[w]e do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive," id. at 597, 112 S.Ct. 2649, and that "[a] relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution." Id. at 598, 112 S.Ct. 2649.
 
 B
 
 37
 Two fundamental principles may therefore be derived from the school prayer cases culminating in Lee.
 
 
 38
 * Formal religious observances are prohibited in public schools because of the danger that they may effect an establishment of religion. See Engel, 370 U.S. at 424-25, 82 S.Ct. 1261 ("[D]aily classroom invocation of God's blessings ... is a religious activity."); Schempp, 374 U.S. at 210, 83 S.Ct. 1560 (Bible reading followed by the Lord's prayer "possesses a devotional and religious character and constitutes in effect a religious observance."); Wallace, 472 U.S. at 58, 105 S.Ct. 2479 (Prayer is of a "wholly religious character."); Lee, 505 U.S. at 586, 112 S.Ct. 2649 (Prayer written by state officials constitutes a "formal religious exercise"). In each of these cases, the Court took pains to stress that not every reference to God in public schools was prohibited. See Engel, 370 U.S. at 435 n. 21, 82 S.Ct. 1261 ("patriotic or ceremonial occasions" which contain "references to the Deity" bear "no true resemblance to the unquestioned religious exercise" of prayer); Schempp, 374 U.S. at 301, 83 S.Ct. 1560 (Brennan, J., concurring) ("Any attempt to impose rigid limits upon the mention of God ... in the classroom would be fraught with dangers."); Wallace, 472 U.S. at 78 n. 5, 105 S.Ct. 2479 (O'Connor, J., concurring) ("the words `under God' in the Pledge" are not unconstitutional); Lee, 505 U.S. at 598, 112 S.Ct. 2649 ("A relentless and all-pervasive attempt to exclude religion ... could itself become inconsistent with the Constitution.").
 
 2
 
 39
 Once it is established that the state is sanctioning a formal religious exercise, then the fact that the students are not required to participate in the formal devotional exercises does not prevent those exercises from being unconstitutional. See Engel, 370 U.S. at 431, 82 S.Ct. 1261 ("[T]he indirect coercive pressure upon religious minorities to conform" to the prayer exercises "is plain."); Schempp, 374 U.S. at 210-11, 83 S.Ct. 1560 ("The fact that some pupils, or theoretically all pupils, might be excused from attendance at the exercises does not mitigate the obligatory nature of the ceremony."); Wallace, 472 U.S. at 57, 105 S.Ct. 2479 (State-sanctioned voluntary prayer in public schools violates Establishment Clause); Lee, 505 U.S. at 592, 112 S.Ct. 2649 ("[P]rayer exercises in public schools carry a particular risk of indirect coercion."). To be sure, Lee is the Court's most elaborate pronouncement with respect to indirect coercion. It identifies the circumstances in which indirect coercion may be said to be unconstitutional: when the government directs "the performance of a formal religious exercise" in such a way as to oblige the participation of objectors. Lee, 505 U.S. at 586, 112 S.Ct. 2649.
 
 III
 
 40
 No court, state or federal, has ever held, even now, that the Supreme Court's school prayer cases apply outside a context of state-sanctioned formal religious observances. But Newdow II finesses all that, and the sleight of hand the majority uses becomes immediately apparent: obfuscate the nature of the exercise at issue and emphasize indirect coercion. The panel majority simply ignores, because they are inconvenient, the "dominant and controlling facts" in Lee and its predecessors: that Establishment Clause violations in public schools are triggered only when "State officials direct the performance of a formal religious exercise." 505 U.S. at 586, 112 S.Ct. 2649 (emphasis added); see also Schempp, 374 U.S. at 210, 83 S.Ct. 1560 ("devotional ... religious observance" prohibited); Wallace, 472 U.S. at 58, 105 S.Ct. 2479 (activities of a "wholly religious character" prohibited).
 
 
 41
 * To avoid a flagrant inconsistency with Lee, and with 40 years of Supreme Court precedent, the two-judge panel majority must first examine whether the act of pledging allegiance is "a religious act." As the Seventh Circuit in Sherman framed it, "Does `under God' make the Pledge a prayer, whose recitation violates the establishment clause of the first amendment?" 980 F.2d at 445. That court answered the question in the negative; the Newdow II majority, in conclusory fashion, simply assumes the affirmative. 328 F.3d at 487 ("[W]e conclude that the school district policy impermissibly coerces a religious act.") (emphasis added).
 
 
 42
 This assertion belies common sense. Most assuredly, to pledge allegiance to flag and country is a patriotic act. After the public and political reaction last summer, it is difficult to believe that anyone can continue to think otherwise. The fact the Pledge is infused with an undoubtedly religious reference does not change the nature of the act itself. The California statute under which the school district promulgated its policy is entitled "[d]aily performance of patriotic exercises in public schools." Cal. Educ.Code § 52720 (emphasis added). The Pledge is recited not just in schools but also at various official events and public ceremonies, including perhaps the most patriotic of occasions — naturalization ceremonies. Generally, the Pledge is recited while standing, facing a United States flag, with the right hand held over the heart, much like the National Anthem. See 4 U.S.C. § 4 (articulating proper procedure for reciting Pledge); 36 U.S.C. § 301 (during anthem "all present... should stand at attention facing the flag with the right hand over the heart."). Whatever one thinks of the normative values underlying the Pledge, they are unquestionably patriotic in nature. Indeed, it is precisely because of the Pledge's explicitly patriotic nature that in 1943 the Supreme Court ruled that no one is required to Pledge allegiance against their will. West Virginia v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
 
 
 43
 In contrast, to pray is to speak directly to God, with bowed head, on bended knee, or some other reverent disposition. It is a solemn and humble approach to the divine in order to give thanks, to petition, to praise, to supplicate, or to ask for guidance. Communal prayer, by definition, is an even more forceful and profound experience for those present. Little wonder that the Supreme Court has recognized the "unique problem" and "particular risk" posed by school prayer to nonparticipating students. Lee, 505 U.S. at 592, 112 S.Ct. 2649 ("[P]rayer exercises in public schools carry a particular risk of indirect coercion."); Schempp, 374 U.S. at 294, 83 S.Ct. 1560 (Brennan, J., concurring) (noting that prayers in public schools "present a unique problem").
 
 
 44
 Not only does the panel majority's conclusion that pledging allegiance is "a religious act" defy common sense, it contradicts our 200-year history and tradition of patriotic references to God. The Supreme Court has insisted that interpretations of the Establishment Clause must comport "with what history reveals was the contemporaneous understanding of its guarantees." Lynch, 465 U.S. at 673, 104 S.Ct. 1355; see also Schempp, 374 U.S. at 294, 83 S.Ct. 1560 ("[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers.") (Brennan, J., concurring).
 
 
 45
 The majority's unpersuasive and problematic disclaimers notwithstanding, Newdow II precipitates a "war with our national tradition," McCollum v. Bd. of Ed., 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 649 (1948), and as Judge Fernandez so eloquently points out in dissent, only the purest exercise in sophistry could save multiple references to our religious heritage in our national life from Newdow II's axe. Of course, the Constitution itself explicitly mentions God, as does the Declaration of Independence, the document which marked us as a separate people. The Gettysburg Address, inconveniently for the majority, contains the same precise phrase — "under God" — found to constitute an Establishment Clause violation in the Pledge.[12] After Newdow II, are we to suppose that, were a school to permit — not require — the recitation of the Constitution, the Declaration of Independence, or the Gettysburg Address in public schools, that too would violate the Constitution? Were the "founders of the United States ... unable to understand their own handiwork[?]" Sherman, 980 F.2d at 445. Indeed, the recitation of the Declaration of Independence would seem to be the better candidate for the chopping block than the Pledge, since the Pledge does not require anyone to acknowledge the personal relationship with God to which the Declaration speaks.[13] So too with our National Anthem and our National Motto.
 
 
 46
 Our national celebration of Thanksgiving dates back to President Washington, which Congress stated was "to be observed by acknowledgment with grateful hearts, the many and signal favours of Almighty God." Lynch, 465 U.S. at 675 n. 2, 104 S.Ct. 1355. Congress made Thanksgiving a permanent holiday in 1941,[14] and Christmas has been a national holiday since 1894.[15] Are pere Newdow's constitutional rights violated when his daughter is told not to attend school on Thanksgiving? On Christmas day? Must school outings to federal courts be prohibited, lest the children be unduly influenced by the dreaded intonation "God save these United States and this honorable Court"?[16] A theory of the Establishment Clause that would have the effect of driving out of our public life the multiple references to the Divine that run through our laws, our rituals, and our ceremonies is no theory at all.
 
 B
 
 47
 As if all of this were not enough, the Supreme Court has gone out of its way to make it plain that the Pledge itself passes constitutional muster. In two of the school prayer cases, the Court noted without so much as a hint of disapproval the fact that the students, in addition to being subject to formal religious observances, also recited the Pledge of Allegiance. See Schempp, 374 U.S. at 207-08, 83 S.Ct. 1560 (noting that the practice in public schools consisted of Bible reading and recitation of the Lord's prayer, followed by recitation of the Pledge); Lee, 505 U.S. at 583, 112 S.Ct. 2649 (noting that "the students stood for the Pledge of Allegiance and remained standing during the rabbi's prayers.").
 
 
 48
 Several other Supreme Court cases contain explicit references to the constitutionality of the Pledge. See Engel, 370 U.S. at 440 n. 5, 82 S.Ct. 1261 (Douglas, J., concurring) ("[The Pledge] in no way run[s] contrary to the First Amendment") (quoting H.R. Rep. No. 1693, 83d Cong., 2d Sess., p. 3); Schempp, 374 U.S. at 304, 83 S.Ct. 1560 (Brennan, J., concurring) ("[R]eciting the pledge may be no more of a religious exercise than the reading aloud of Lincolns' Gettysburg Address."); Wallace, 472 U.S. at 78 n. 5, 105 S.Ct. 2479 (O'Connor, J., concurring) ("[T]he words `under God' in the Pledge ... serve as an acknowledgment of religion."); Co. of Allegheny v. ACLU, 492 U.S. 573, 602-03, 109 S.Ct. 3086, 106 L.Ed.2d 472 (Blackmun, J., for the court) ("Our previous opinions have considered in dicta ... the pledge, characterizing [it] as consistent with the proposition that government may not communicate an endorsement of religious belief."); Lynch v. Donnelly, 465 U.S. 668, 676, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (Burger, C.J., for the court) ("Other examples of reference to our religious heritage are found ... in the language `One nation under God,' as part of the Pledge of Allegiance to the American flag. That pledge is recited by many thousands of public school children — and adults — every year.").
 
 
 49
 The panel majority's answer to these myriad statements from our high court is summarily to dismiss them as dicta. However, "dicta of the Supreme Court have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold. We should not blandly shrug them off because they were not a holding." Zal v. Steppe, 968 F.2d 924, 935 (9th Cir. 1992) (Noonan, J., concurring and dissenting in part); see also United States v. Baird, 85 F.3d 450, 453 (9th Cir.1996) ("[W]e treat Supreme Court dicta with due deference.").[17]
 
 C
 
 50
 The Newdow II majority, then, finds itself caught between a rock and a hard place — the recitation of the Pledge is not a formal religious act, while patriotic invocations of God do not give rise to Establishment Clause violations. It nonetheless manages to skirt these obstacles to reach its indirect coercion analysis. Newdow II's conclusory foray into the social sciences is a case study, an advertisement, for why it is that the Supreme Court has anchored coercion analysis only to those situations where "formal religious exercises" take place in our public schools. The panel majority seeks to protect dissenters at the risk of courting some unpopularity, but this is not the test. "[O]ffense alone does not in every case show a violation.... and sometimes to endure social isolation or even anger may be the price of conscience or nonconformity." Lee, 505 U.S. at 597-98, 112 S.Ct. 2649. The Newdow II majority's expansive application of the coercion test is ill-suited to a society as diverse as ours, since almost every cultural practice is bound to offend someone's sensibilities. In affording Michael Newdow the right to impose his views on others, Newdow II affords him a right to be fastidiously intolerant and self-indulgent. In granting him this supposed right, moreover, the two-judge panel majority has not eliminated feelings of discomfort and isolation, it has simply shifted them from one group to another.
 
 
 51
 Newdow II's psychological ipse dixit is also delivered without reference or regard to our collective experience in the half-century since the passage of the offending statute. In that time, generations of Americans have grown up reciting the Pledge, religious tolerance and diversity has flourished in this country, and we have become a beacon for other nations in this regard. As Judge Fernandez observes, "it is difficult to detect any signs of incipient theocracy springing up since the Pledge was amended in 1954." Newdow I, 292 F.3d at 614 n. 4 (Fernandez, J., dissenting).
 
 IV
 
 52
 In fairness to the Newdow II panel majority, its professed "neutrality" does have some plausible basis in the case law of the Supreme Court, which has undoubtedly constructed a "fractured and incoherent doctrinal path" in the Establishment Clause area, broadly speaking. Sep. of Church and State Comm. v. City of Eugene, 93 F.3d 617, 622 (9th Cir.1996) (O'Scannlain, J., concurring). Indeed, its Establishment Clause cases sometimes "more closely resemble ad hoc Delphic pronouncements than models of guiding legal principles." Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 282 (5th Cir.1996) (Jones, J., dissenting from denial of rehearing en banc). Supreme Court Justices themselves have recognized that if some of its reasoning "were to be applied logically, it would lead to the elimination" of many cherished, long-standing practices. Co. of Allegheny, 492 U.S. at 674 n. 10, 109 S.Ct. 3086 (Kennedy, J., dissenting).
 
 
 53
 With respect to the issue presented in this case, however, the Supreme Court has displayed remarkable consistency — patriotic invocations of God simply have no tendency to establish a state religion. Even Justice Brennan, that most stalwart of separationists, recognized that some official acknowledgment of God is appropriate "if the government is not to adopt a stilted indifference to the religious life of the people." Lynch, 465 U.S. at 714, 104 S.Ct. 1355 (Brennan, J., dissenting). The decision reached in Newdow II does precisely that: it adopts a stilted indifference to our past and present realities as a predominantly religious people.
 
 
 54
 But Newdow II goes further, and confers a favored status on atheism in our public life. In a society with a pervasive public sector, our public schools are a most important means for transmitting ideas and values to future generations. The silence the majority commands is not neutral — it itself conveys a powerful message, and creates a distorted impression about the place of religion in our national life.[18] The absolute prohibition on any mention of God in our schools creates a bias against religion. The panel majority cannot credibly advance the notion that Newdow II is neutral with respect to belief versus non-belief; it affirmatively favors the latter to the former. One wonders, then, does atheism become the default religion protected by the Establishment Clause?
 
 
 55
 In short, a lack of clarity in the Supreme Court's Establishment Clause cases generally does not help to explain or to justify the panel majority's decision with respect to this particular issue. Put simply, the panel was asked to decide whether the recitation of the Pledge of Allegiance in public schools amounted to a government establishment of religion. The answer to that question is clearly, obviously, no. We made a grave error in failing to take Newdow I en banc, and we have failed to correct that error ourselves. Now we have Newdow II. Perhaps the Supreme Court will have the opportunity to correct the error for us. I must respectfully dissent from the order denying reconsideration en banc.
 
 
 
 Notes:
 
 
 [1]
 Judge Reinhardt's protestations to the contrary notwithstanding, I, too, believe that "[o]ur judicial charge is to stand above the inflamed passions of the public."Dazo v. Globe Airport Sec. Serv., 295 F.3d 934, 943 (9th Cir.2002) (O'Scannlain, J., concurring and dissenting). My disagreement with the panel majority has nothing to do with bending to the will of an outraged populace, and everything to do with the fact that Judge Goodwin and Judge Reinhardt misinterpret the Constitution and 40 years of Supreme Court precedent. That most people understand this makes the decision no less wrong. It doesn't take an Article III judge to recognize that the voluntary recitation of the Pledge of Allegiance in public school does not violate the First Amendment.
 
 
 [2]
 This case presents the classic situation required for our court to rehear a case en banc. En banc consideration would have allowed us to correct the error of a prior panel's decision with respect to the Pledgeand resolve a constitutional question of exceptional importance that affects the lives of millions of school children who reside within the geographical boundaries of the Ninth Circuit. See Fed. R.App. P. 35(a). The exceptional importance of this case reinforces the need for correction of the panel's mistaken view of our Constitution.
 
 
 [3]
 U.S. Const. amend. I. ("Congress shall make no law respecting anestablishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.") (emphasis added).
 
 
 [4]
 See U.S. Dep't of Ed., Nat'l Ctr. for Ed. Statistics, available at http://nces.ed.gov/pubs2002/snf_report/table_01_1.asp. The approximate figure is for the school year 2000-01, comprising the states of Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon and Washington, as well as Guam and the Northern Marianas.
 
 
 [5]
 4 U.S.C. § 4 ("The Pledge of Allegiance to the Flag: `I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.'")
 
 
 [6]
 Cal. Educ.Code § 52720. This section provides that "at the beginning of the first regularly scheduled class or activity period ... there shall be conducted appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy the requirements of this section."
 
 
 [7]
 U.S. Const. art. VII. ("Year ofour Lord") (emphasis added).
 
 
 [8]
 The Declaration of Independence contains multiple references to God. The founders claimed the right to "dissolve the political bands" based on "the Laws of Nature and ofNature's God." The most famous passage, of course, is that "all men are created equal, that they are endowed by their Creator with certain unalienable Rights." Subsequently, the signatories "appeal[] to the Supreme Judge of the world to rectify their intentions."
 
 
 [9]
 On November 19, 1863, President Lincoln declared "that this Nation,under God, shall have a new birth of freedom—and that Government of the people, by the people, for the people, shall not perish from the earth."
 
 
 [10]
 See 36 U.S.C. § 302. ("`In God we trust' is the nationalmotto.") (emphasis added).
 
 
 [11]
 See 36 U.S.C. § 301(a) ("The composition consisting of the words and music known as the Star-Spangled Banner is the national anthem."). In fact, the Anthem is much more explicitly religious in content than the Pledge, and much more than a `mere' profession of the composer's faith in a Supreme Being, as the majority would have it. See Newdow II, 328 F.3d at 489. Consider the following passage from the fourth stanza: "Blest with victory and peace, may the heaven-rescued land, Praise the Power that hath made and preserved us a nation. Then conquer we must, when our cause is just, And this be our motto: `In God is our trust.'" (emphasis added).
 
 
 [12]
 See infra footnote 9.
 
 
 [13]
 See infra footnote 8.
 
 
 [14]
 See 5 U.S.C. § 6103(a).
 
 
 [15]
 See id.
 
 
 [16]
 Indeed, even our own court's formal announcement to open sessions contains the offending word: "Hear ye! hear ye! All persons having business with the honorable, the United States Court of Appeals for the Ninth Circuit will now draw near, give your attention and you will be heard, for this court is now in sessionGod save these United States and this honorable Court." (emphasis added).
 
 
 [17]
 Other courts have, unremarkably enough, not been so flippant when it comes to considering consistent Supreme Court dicta on this issueSee Sherman, 980 F.2d at 448 ("[A]n inferior court had best respect what the majority says rather than read between the lines. If the Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so."); Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); ACLU v. Capitol Square Review, 243 F.3d 289, 301 n. 10 (6th Cir. 2001) ("We should ... be amazed if the Supreme Court were now to question the constitutionality of the [revised Pledge]"). Indeed, the unanimity on this point relative to Newdow II is striking.
 
 
 [18]
 See Michael W. McConnell, Religious Freedom at the Crossroads, 59 U.Chi.L.Rev. 115, 189 (1992).
 
 
 
 56
 McKEOWN, Circuit Judge, with whom MICHAEL DALY HAWKINS, THOMAS, and RAWLINSON, Circuit Judges, join, dissenting from the denial of rehearing en banc.
 
 
 57
 The recitation of the Pledge of Allegiance by school children presents a constitutional question of exceptional importance that merits reconsideration by the en banc court. See Fed. R.App. P. 35(a)(2) (en banc hearing appropriate when "the proceeding involves a question of exceptional importance"). Although not every case of exceptional importance can or should be reheard en banc, this is a case that should be reheard. I respectfully dissent from the court's decision to deny rehearing en banc.
 
 OPINION
 
 58
 GOODWIN, Circuit Judge.
 
 
 59
 Michael Newdow appeals pro se a judgment dismissing his challenge to the constitutionality of the words "under God" in the Pledge of Allegiance to the Flag. Newdow argues that the addition of these words by a 1954 federal statute to the previous version of the Pledge of Allegiance (which made no reference to God) and the daily recitation in the classroom of the Pledge of Allegiance, with the added words included, by his daughter's public school teacher are violations of the Establishment Clause of the First Amendment to the United States Constitution.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 60
 Newdow is an atheist whose daughter attends public elementary school in the Elk Grove Unified School District ("EGUSD") in California. In accordance with state law and a school district rule, EGUSD teachers begin each school day by leading their students in a recitation of the Pledge of Allegiance ("the Pledge"). The California Education Code requires that public schools begin each school day with "appropriate patriotic exercises" and that "[t]he giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy" this requirement. Cal. Educ. Code § 52720 (1989) (hereinafter "California statute").[1] To implement the California statute, the school district that Newdow's daughter attends has promulgated a policy that states, in pertinent part: "Each elementary school class [shall] recite the pledge of allegiance to the flag once each day."
 
 
 61
 The classmates of Newdow's daughter in the EGUSD are led by their teacher in reciting the Pledge codified in federal law. On June 22, 1942, Congress first codified the Pledge as "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all." Pub.L. No. 623, Ch. 435, § 7, 56 Stat. 380 (1942) (codified at 36 U.S.C. § 1972). On June 14, 1954, Congress amended Section 1972 to add the words "under God" after the word "Nation." Pub.L. No. 396, Ch. 297, 68 Stat. 249 (1954) ("1954 Act"). The Pledge is currently codified as "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all." 4 U.S.C. § 4 (1998) (Title 36 was revised and recodified by Pub.L. No. 105-225, § 2(a), 112 Stat. 1494 (1998). Section 172 was abolished, and the Pledge is now found in Title 4.)
 
 
 62
 Newdow does not allege that his daughter's teacher or school district requires his daughter to participate in reciting the Pledge.[2] Rather, he claims that his daughter is injured when she is compelled to "watch and listen as her state-employed teacher in her state-run school leads her classmates in a ritual proclaiming that there is a God, and that our's [sic] is `one nation under God.'"
 
 
 63
 Newdow's complaint in the district court challenged the constitutionality, under the First Amendment, of the 1954 Act, the California statute, and the school district's policy requiring teachers to lead willing students in recitation of the Pledge. He sought declaratory and injunctive relief, but did not seek damages.
 
 
 64
 The school districts and their superintendents (collectively, "school district defendants") filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. Magistrate Judge Peter A. Nowinski held a hearing at which the school district defendants requested that the court rule only on the constitutionality of the Pledge, and defer any ruling on sovereign immunity. The United States Congress, the United States, and the President of the United States (collectively, "the federal defendants") joined in the motion to dismiss filed by the school district defendants. The magistrate judge reported findings and a recommendation that the district court hold that the daily Pledge ceremony in the schools did not violate the Establishment Clause. District Judge Edward J. Schwartz approved the recommendation and entered a judgment of dismissal. This appeal followed.
 
 DISCUSSION
 A. Jurisdiction
 
 65
 Newdow asks the district court to order the President of the United States ("the President") to "alter, modify or repeal" the Pledge by removing the words "under God"; and to order the United States Congress ("Congress") "immediately to act to remove the words `under God' from the Pledge." The President, however, is not an appropriate defendant in an action challenging the constitutionality of a federal statute. See Franklin v. Massachusetts, 505 U.S. 788, 802-03, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (plurality) (observing that a court of the United States "`has no jurisdiction of a bill to enjoin the President in the performance of his official duties'") (quoting Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866)).
 
 
 66
 Similarly, in light of the Speech and Debate Clause of the Constitution, Art. I, § 6, cl. 1, the federal courts lack jurisdiction to issue orders directing Congress to enact or amend legislation. See Eastland v. United States Servicemen's Fund, 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Because the words that amended the Pledge were enacted into law by statute, the district court may not direct Congress to delete those words any more than it may order the President to take such action. All this, of course, is aside from the fact that the President has no authority to amend a statute or declare a law unconstitutional, those functions being reserved to Congress and the federal judiciary respectively.
 
 
 67
 Newdow nevertheless argues that because the 1954 Act violates the Establishment Clause, Congress should not be protected by the Speech and Debate Clause. This argument misses the jurisdictional, or separation of powers, point. As the Court held in Eastland, in determining whether or not the acts of members of Congress are protected by the Speech and Debate Clause, the court looks solely to whether or not the acts fall within the legitimate legislative sphere; if they do, Congress is protected by the absolute prohibition of the Clause against being "questioned in any other Place." Id. at 501. "If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it." Id. at 508-09, 95 S.Ct. 1813.
 
 B. The State of California as a defendant
 
 68
 The State of California did not join in the motion to dismiss or otherwise participate in the district court proceedings. It did, however, sub silentio, receive the benefit of the district court's ruling dismissing the complaint. Accordingly, a reversal of the order would result in the reinstatement of the complaint against the state. With respect to the validity of the California statute, however, unlike in the case of the Congressional enactment and the school district policy, no arguments, legal or otherwise, were advanced by the parties in the district court. Thus, we do not address separately the validity of the California statute.
 
 C. Standing
 
 69
 Article III standing is a jurisdictional issue. See United States v. Viltrakis, 108 F.3d 1159, 1160 (9th Cir.1997). Accordingly, it "may be raised at any stage of the proceedings, including for the first time on appeal." See A-Z Intern. v. Phillips, 179 F.3d 1187, 1190-91 (9th Cir.1999). To satisfy standing requirements, a plaintiff must prove that "(1) it has suffered an `injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
 
 
 70
 Newdow has standing as a parent to challenge a practice that interferes with his right to direct the religious education of his daughter. "Parents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right." Doe v. Madison Sch. Dist. No. 321, 177 F.3d 789, 795 (9th Cir.1999) (en banc); see also Grove v. Mead Sch. Dist. No. 354, 753 F.2d 1528, 1532 (9th Cir.1985) ("Appellants have standing to challenge alleged violations of the establishment clause of the First Amendment if they are directly affected by use of [the challenged book] in the English curriculum. [Appellant] has standing as a parent whose right to direct the religious training of her child is allegedly affected.") (citation omitted).
 
 
 71
 Newdow has standing to challenge the EGUSD's policy and practice regarding the recitation of the Pledge because his daughter is currently enrolled in elementary school in the EGUSD. However, Newdow has no standing to challenge the SCUSD's policy and practice because his daughter is not currently a student there. The SCUSD and its superintendent have not caused Newdow or his daughter an "injury in fact" that is "actual or imminent, not conjectural or hypothetical." Laidlaw, 528 U.S. at 180, 120 S.Ct. 693 (citing Lujan, 504 U.S. at 560-561, 112 S.Ct. 2130).
 
 D. Establishment Clause
 
 72
 The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, a provision that "the Fourteenth Amendment makes applicable with full force to the States and their school districts." Lee v. Weisman, 505 U.S. 577, 580, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Over the last three decades, the Supreme Court has used three interrelated tests to analyze alleged violations of the Establishment Clause in the realm of public education: the three-prong test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); the "endorsement" test, first articulated by Justice O'Connor in her concurring opinion in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), and later adopted by a majority of the Court in County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); and the "coercion" test first used by the Court in Lee.
 
 
 73
 In 1971, in the context of unconstitutional state aid to nonpublic schools, the Supreme Court in Lemon set forth the following test for evaluating alleged Establishment Clause violations. To survive the "Lemon test," the government conduct in question (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105. The Supreme Court applied the Lemon test to every Establishment case it decided between 1971 and 1984, with the exception of Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the case upholding legislative prayer.[3] See Wallace, 472 U.S. at 63, 105 S.Ct. 2479 (Powell, J., concurring).
 
 
 74
 In the 1984 Lynch case, which upheld the inclusion of a nativity scene in a city's Christmas display, Justice O'Connor wrote a concurring opinion in order to suggest a "clarification" of Establishment Clause jurisprudence. 465 U.S. at 687, 104 S.Ct. 1355 (O'Connor, J., concurring).
 
 
 75
 Justice O'Connor's "endorsement" test effectively collapsed the first two prongs of the Lemon test:
 
 
 76
 The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is excessive entanglement with religious institutions.... The second and more direct infringement is government endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.
 
 
 77
 Id. at 687-88, 79 L.Ed.2d 604 (O'Connor, J., concurring).
 
 
 78
 The Court formulated the "coercion test" when it held unconstitutional the practice of including invocations and benedictions in the form of "nonsectarian" prayers at public school graduation ceremonies. Lee, 505 U.S. at 599, 112 S.Ct. 2649. Declining to reconsider the validity of the Lemon test, the Court in Lee found it unnecessary to apply the Lemon test to find the challenged practices unconstitutional. Id. at 587, 112 S.Ct. 2649. Rather, it relied on the principle that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise to act in a way which establishes a state religion or religious faith, or tends to do so." Id. (citations and internal quotation marks omitted). The Court first examined the degree of school involvement in the prayer, and found that "the graduation prayers bore the imprint of the State and thus put school-age children who objected in an untenable position." Id. at 590, 112 S.Ct. 2649. The next issue the Court considered was "the position of the students, both those who desired the prayer and she who did not." Id. Noting that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," id. at 592, 112 S.Ct. 2649, the Court held that the school district's supervision and control of the graduation ceremony put impermissible pressure on students to participate in, or at least show respect during, the prayer, id. at 593, 112 S.Ct. 2649. The Court concluded that primary and secondary school children may not be placed in the dilemma of either participating in a religious ceremony or protesting. Id. at 594, 112 S.Ct. 2649.
 
 
 79
 Finally, in its most recent school prayer case, the Supreme Court applied the Lemon test, the endorsement test, and the coercion test to strike down a school district's policy of permitting student-led "invocations" before high school football games. See Santa Fe Independent School Dist. v. Doe, 530 U.S. 290, 310-16, 120 S.Ct. 2266, 147 L.Ed.2d 295. Citing Lee, the Court held that "the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." Id. at 312, 120 S.Ct. 2266. Applying the Lemon test, the Court found that the school district policy was facially unconstitutional because it did not have a secular purpose. Id. at 314-16. The Court also used language associated with the endorsement test. Id. at 315, 120 S.Ct. 2266 ("[T]his policy was implemented with the purpose of endorsing school prayer."); id. at 317, 120 S.Ct. 2266 ("Government efforts to endorse religion cannot evade constitutional reproach based solely on the remote possibility that those attempts may fail.").
 
 
 80
 We are free to apply any or all of the three tests, and to invalidate any measure that fails any one of them. Because we conclude that the school district policy impermissibly coerces a religious act and accordingly hold the policy unconstitutional, we need not consider whether the policy fails the endorsement test or the Lemon test as well.
 
 
 81
 In the context of the Pledge, the statement that the United States is a nation "under God" is a profession of a religious belief, namely, a belief in monotheism. The recitation that ours is a nation "under God" is not a mere acknowledgment that many Americans believe in a deity. Nor is it merely descriptive of the undeniable historical significance of religion in the founding of the Republic. Rather, the phrase "one nation under God" in the context of the Pledge is normative. To recite the Pledge is not to describe the United States; instead, it is to swear allegiance to the values for which the flag stands: unity, indivisibility, liberty, justice, and — since 1954 — monotheism. A profession that we are a nation "under God" is identical, for Establishment Clause purposes, to a profession that we are a nation "under Jesus," a nation "under Vishnu," a nation "under Zeus," or a nation "under no god," because none of these professions can be neutral with respect to religion. The school district's practice of teacher-led recitation of the Pledge aims to inculcate in students a respect for the ideals set forth in the Pledge, including the religious values it incorporates.
 
 
 82
 The Supreme Court recognized the normative and ideological nature of the Pledge in Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. There, the Court held unconstitutional a school district's wartime policy of punishing students who refused to recite the Pledge and salute the flag. Id. at 642, 63 S.Ct. 1178. The Court noted that the school district was compelling the students "to declare a belief," id. at 631, 63 S.Ct. 1178, and "requir[ing] the individual to communicate by word and sign his acceptance of the political ideas [the flag] ... bespeaks," id. at 633, 63 S.Ct. 1178. "[T]he compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind." Id. The Court emphasized that the political concepts articulated in the Pledge[4] were idealistic, not descriptive: "`[L]iberty and justice for all,' if it must be accepted as descriptive of the present order rather than an ideal, might to some seem an overstatement." Id. at 634 n. 14, 63 S.Ct. 1178. The Court concluded that: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642, 63 S.Ct. 1178.
 
 
 83
 The school district's policy here, like the school's action in Lee, places students in the untenable position of choosing between participating in an exercise with religious content or protesting. The defendants argue that the religious content of "one nation under God" is minimal. To an atheist or a believer in non-Judeo-Christian religions or philosophies, however, this phrase may reasonably appear to be an attempt to enforce a "religious orthodoxy" of monotheism, and is therefore impermissible. As the Court observed with respect to the graduation prayer in Lee: "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." Lee, 505 U.S. at 592, 112 S.Ct. 2649.
 
 
 84
 The coercive effect of the policy here is particularly pronounced in the school setting given the age and impressionability of schoolchildren, and their understanding that they are required to adhere to the norms set by their school, their teacher and their fellow students.[5] Furthermore, under Lee, non-compulsory participation is no basis for distinguishing Barnette from the case at bar because, even without a recitation requirement for each child, the mere presence in the classroom every day as peers recite the statement "one nation under God" has a coercive effect.[6] The coercive effect of the Pledge is also made even more apparent when we consider the legislative history of the Act that introduced the phrase "under God." These words were designed to be recited daily in school classrooms. President Eisenhower, during the Act's signing ceremony, stated: "From this day forward, the millions of our school children will daily proclaim in every city and town, every village and rural schoolhouse, the dedication of our Nation and our people to the Almighty." 100 Cong.Rec. 8618 (1954) (statement of Sen. Ferguson incorporating signing statement of President Eisenhower).[7] All in all, there can be little doubt that under the controlling Supreme Court cases the school district's policy fails the coercion test.[8]
 
 
 85
 The Supreme Court has addressed the Pledge in passing, and we owe due deference to its dicta. See United States v. Baird, 85 F.3d 450, 453 (9th Cir.1996). Our opinion, however, is not inconsistent with this dicta. In Allegheny, the Court noted that it had "considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief." 492 U.S. at 602-03, 109 S.Ct. 3086. And in Lynch, the Court observed that students recited the pledge daily, but only to support its point that there is a long tradition of "official acknowledgment" of religion. 465 U.S. at 674, 676, 104 S.Ct. 1355. Neither of these two references speaks to the issue here. We may assume arguendo that public officials do not unconstitutionally endorse religion when they recite the Pledge, yet it does not follow that schools may coerce impressionable young schoolchildren to recite it, or even to stand mute while it is being recited by their classmates.
 
 
 86
 Our decision is not inconsistent with Engel, which approved of encouraging students to "recit[e] historical documents such as the Declaration of Independence which contain references to the Deity or... sing[] officially espoused anthems which include the composer's professions of faith in a Supreme Being." 370 U.S. at 435 n. 21, 82 S.Ct. 1261. The Pledge differs from the Declaration and the anthem in that its reference to God, in textual and historical context, is not merely a reflection of the author's profession of faith. It is, by design, an affirmation by the person reciting it. "I pledge" is a performative statement. See J.L. Austin, How to Do Things with Words (J.O. Urmsson & Marina Sbisa eds., Harvard Univ. Press 1975) (1962). To pledge allegiance to something is to alter one's moral relationship to it, and not merely to repeat the words of an historical document or anthem.
 
 
 87
 The only other United States Court of Appeals to consider the issue is the Seventh Circuit, which held in Sherman v. Community Consolidated School District 21, 980 F.2d 437 (7th Cir.1992), that a policy similar to the one before us regarding the recitation of the Pledge of Allegiance containing the words "one nation under God" was constitutional. The Sherman court first stated that:
 
 
 88
 If as Barnette holds no state may require anyone to recite the Pledge, and if as the prayer cases hold the recitation by a teacher or rabbi of unwelcome words is coercion, then the Pledge of Allegiance becomes unconstitutional under all circumstances, just as no school may read from a holy scripture at the start of class.
 
 
 89
 980 F.2d at 444. It then concludes, however, that this reasoning is flawed because the First Amendment "[does] not establish general rules about speech or schools; [it] call[s] for religion to be treated differently." Id. We have some difficulty understanding this statement; we do not believe that the Constitution prohibits compulsory patriotism as in Barnette, but permits compulsory religion as in this case. If government-endorsed religion is to be treated differently from government-endorsed patriotism, the treatment must be less favorable, not more.
 
 
 90
 The Seventh Circuit makes an even more serious error, however. It not only refuses to apply the Lemon test because of the Supreme Court's criticism of that test in Lee, but it also fails to apply the coercion test from Lee. Circuit courts are not free to ignore Supreme Court precedent in this manner. Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Instead of applying any of the tests announced by the Supreme Court, the Seventh Circuit simply frames the question as follows: "Must ceremonial references in civic life to a deity be understood as prayer, or support for all monotheistic religions, to the exclusion of atheists and those who worship multiple gods?" 980 F.2d at 445. For the reasons we have already explained, this question is simply not dispositive of whether the school district policy impermissibly coerces a religious act.
 
 
 91
 In light of Supreme Court precedent, we hold that the school district's policy and practice of teacher-led recitation of the Pledge, with the inclusion of the added words "under God," violates the Establishment Clause.
 
 
 92
 In addition to the relief that Newdow seeks against the school district — relief to which he is entitled — Newdow seeks a declaration as to the constitutionality of the 1954 Act. The district court did not discuss that question because it dismissed Newdow's complaint on the basis of its holding that the school district's policy did not violate the First Amendment. Given our contrary holding, we must consider whether to grant Newdow's claim for declaratory relief as to the Act. Normally, whether to decide a claim for declaratory judgment is left to the discretion of the district court. 28 U.S.C. § 2201(a); see also Government Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1222-23 (9th Cir. 1998). We doubt that, given the relief to which we decide Newdow is entitled, the district court would have exercised its discretionary power to resolve, in the present case, the additional issue as to which Newdow seeks declaratory relief. Accordingly, we decline to reach that issue here.
 
 
 93
 The judgment of dismissal is vacated with respect to Newdow's claim that the school district's Pledge policy violates the Establishment Clause and the cause is remanded for further proceedings consistent with our holding. Plaintiff is to recover costs on this appeal.
 
 
 94
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The relevant portion of California Education Code § 52720 reads:
 In every public elementary school each day during the school year at the beginning of the first regularly scheduled class or activity period at which the majority of the pupils of the school normally begin the schoolday, there shall be conducted appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy the requirements of this section.
 
 
 [2]
 Compelling students to recite the Pledge was held to be a First Amendment violation inWest Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."). Barnette was decided before the 1954 Act added the words "under God" to the Pledge.
 
 
 [3]
 InMarsh, the Court "held that the Nebraska Legislature's practice of opening each day's session with a prayer by a chaplain paid by the State did not violate the Establishment Clause of the First Amendment. [The] holding was based upon the historical acceptance of the practice that had become `part of the fabric of our society.'" Wallace, 472 U.S. at 63 n. 4, 105 S.Ct. 2479 (Powell, J., concurring) (quoting Marsh, 463 U.S. at 792, 103 S.Ct. 3330).
 
 
 [4]
 Barnette was decided before "under God" was added, and thus the Court's discussion was limited to the political ideals contained in the Pledge.
 
 
 [5]
 The "subtle and indirect" social pressure which permeates the classroom also renders more acute the message sent to non-believing school-children that they are outsidersSee Lee, 505 U.S. at 592-93, 112 S.Ct. 2649 (stating that "the risk of indirect coercion" from prayer exercises is particularly "pronounced" in elementary and secondary public school because students are subjected to peer pressure and public pressure which is "as real as any overt compulsion").
 
 
 [6]
 The objection to the Pledge inBarnette, like in the case at bar, was based upon a religious ground. The Pledge in the classroom context imposes upon schoolchildren the constitutionally unacceptable choice between participating and protesting. Recognizing the severity of the effect of this form of coercion on children, the Supreme Court in Lee stated, "the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position." 505 U.S. at 593, 112 S.Ct. 2649.
 
 
 [7]
 In addition, the legislative history of the 1954 Act makes it plain that the sponsors of the amendment knew about and capitalized on the state laws and school district rules that mandate recitation of the Pledge. The legislation's House sponsor, Representative Louis C. Rabaut, testified at the Congressional hearing that "the children of our land, in the daily recitation of the pledge in school, will be daily impressed with a true understanding of our way of life and its origins." This statement was incorporated into the report of the House Judiciary Committee. H.R. Rep. No. 83-1693, at 3 (1954),reprinted in 1954 U.S.C.C.A.N 2339, 2341.
 
 
 [8]
 InAronow v. United States, 432 F.2d 242 (9th Cir.1970), this court, without reaching the question of standing, upheld the inscription of the phrase "In God We Trust" on our coins and currency. But cf. Wooley v. Maynard, 430 U.S. 705, 722, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (Rehnquist, J., dissenting) (stating that the majority's holding leads logically to the conclusion that "In God We Trust" is an unconstitutional affirmation of belief). In any event, Aronow is distinguishable in many ways from the present case. The most important distinction is that school children are not coerced into reciting or otherwise actively led to participating in an endorsement of the markings on the money in circulation.
 
 
 
 95
 FERNANDEZ, Circuit Judge, concurring and dissenting.
 
 
 96
 I concur in parts A, B and C of the majority opinion, but dissent as to part D.
 
 
 97
 We are asked to hold that inclusion of the phrase "under God" in this nation's Pledge of Allegiance violates the religion clauses of the Constitution of the United States. We should do no such thing. We should, instead, recognize that those clauses were not designed to drive religious expression out of public thought; they were written to avoid discrimination.[1]
 
 
 98
 We can run through some or all of the tests and concepts which have floated to the surface from time to time. Were we to do so, the one that appeals most to me, the one I think to be correct, is the concept that what the religion clauses of the First Amendment require is neutrality; that those clauses are, in effect, an early kind of equal protection provision and assure that government will neither discriminate for nor discriminate against a religion or religions. See Gentala v. City of Tucson, 244 F.3d 1065, 1083-86 (9th Cir.) (en banc) (Fernandez, J., dissenting), cert. granted and judgment vacated by 534 U.S. 946, 122 S.Ct. 340, 151 L.Ed.2d 256 (2001); Goehring v. Brophy, 94 F.3d 1294, 1306-07 (9th Cir.1996) (Fernandez, J., concurring). But, legal world abstractions and ruminations aside, when all is said and done, the danger that "under God" in our Pledge of Allegiance will tend to bring about a theocracy or suppress somebody's beliefs is so minuscule as to be de minimis. The danger that phrase presents to our First Amendment freedoms is picayune at most.
 
 
 99
 Judges, including Supreme Court Justices, have recognized the lack of danger in that and similar expressions for decades, if not for centuries, as have presidents[2] and members of our Congress. See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 602-03, 672-73, 109 S.Ct. 3086, 3106, 3143, 106 L.Ed.2d 472 (1989); Wallace v. Jaffree, 472 U.S. 38, 78 n. 5, 105 S.Ct. 2479, 2501 n. 5, 86 L.Ed.2d 29 (1985); Lynch v. Donnelly, 465 U.S. 668, 676, 693, 716, 104 S.Ct. 1355, 1361, 1369, 1382, 79 L.Ed.2d 604 (1984); Abington Sch. Dist. v. Schempp, 374 U.S. 203, 306-08, 83 S.Ct. 1560, 1615-16, 10 L.Ed.2d 844 (1963);[3] Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617, 622 (9th Cir.1996) (O'Scanlain, J., concurring); Gaylor v. United States, 74 F.3d 214, 217-18 (10th Cir.1996); Sherman v. Community Consol. Sch. Dist. 21, 980 F.2d 437, 445-48 (7th Cir.1992); O'Hair v. Murray, 588 F.2d 1144 (5th Cir.1979) (per curiam); Aronow v. United States, 432 F.2d 242, 243-44 (9th Cir.1970); cf. Marsh v. Chambers, 463 U.S. 783, 795, 103 S.Ct. 3330, 3338, 77 L.Ed.2d 1019 (1983) (legislative prayer). I think it is worth stating a little more about two of the cases which I have just cited. In County of Allegheny, 492 U.S. at 602-03, 109 S.Ct. at 3106, the Supreme Court had this to say: "Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief." The Seventh Circuit, reacting in part to that statement, has wisely expressed the following thought:
 
 
 100
 Plaintiffs observe that the Court sometimes changes its tune when it confronts a subject directly. True enough, but an inferior court had best respect what the majority says rather than read between the lines. If the Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so.
 
 
 101
 Sherman, 980 F.2d at 448.
 
 
 102
 Some, who rather choke on the notion of de minimis, have resorted to the euphemism "ceremonial deism." See, e.g., Lynch, 465 U.S. at 716, 104 S.Ct. at 1382 (Brennan, J., dissenting). But whatever it is called (I care not), it comes to this: such phrases as "In God We Trust," or "under God" have no tendency to establish a religion in this country or to suppress anyone's exercise, or non-exercise, of religion, except in the fevered eye of persons who most fervently would like to drive all tincture of religion out of the public life of our polity. Those expressions have not caused any real harm of that sort over the years since 1791, and are not likely to do so in the future.[4] As I see it, that is not because they are drained of meaning.[5] Rather, as I have already indicated, it is because their tendency to establish religion (or affect its exercise) is exiguous. I recognize that some people may not feel good about hearing the phrases recited in their presence, but, then, others might not feel good if they are omitted. At any rate, the Constitution is a practical and balanced charter for the just governance of a free people in a vast territory. Thus, although we do feel good when we contemplate the effects of its inspiring phrasing and majestic promises, it is not primarily a feel-good prescription.[6] In West Virginia Board of Education v. Barnette, 319 U.S. 624, 630, 642, 63 S.Ct. 1178, 1181, 1187, 87 L.Ed. 1628, (1943), for example, the Supreme Court did not say that the Pledge could not be recited in the presence of Jehovah's Witness children; it merely said that they did not have to recite it.[7] That fully protected their constitutional rights by precluding the government from trenching upon "the sphere of intellect and spirit." Id. at 642, 63 S.Ct. at 1187. As the Court pointed out, their religiously based refusal "to participate in the ceremony [would] not interfere with or deny rights of others to do so." Id. at 630, 63 S.Ct. at 1181. We should not permit Newdow's feel-good concept to change that balance.
 
 
 103
 My reading of the stelliscript suggests that upon Newdow's theory of our Constitution, accepted by my colleagues today, we will soon find ourselves prohibited from using our album of patriotic songs in many public settings. "God Bless America" and "America The Beautiful" will be gone for sure, and while use of the first three stanzas of "The Star Spangled Banner" will still be permissible, we will be precluded from straying into the fourth.[8] And currency beware! Judges can accept those results if they limit themselves to elements and tests, while failing to look at the good sense and principles that animated those tests in the first place. But they do so at the price of removing a vestige of the awe all of us, including our children, must feel at the immenseness of the universe and our own small place within it, as well as the wonder we must feel at the good fortune of our country. That will cool the febrile nerves of a few at the cost of removing the healthy glow conferred upon many citizens when the forbidden verses, or phrases, are uttered, read, or seen.
 
 
 104
 In short, I cannot accept the eliding of the simple phrase "under God" from our Pledge of Allegiance in any setting, when it is obvious that its tendency to establish religion in this country or to interfere with the free exercise (or non-exercise) of religion is de minimis.[9]
 
 
 105
 Thus, I respectfully concur in part and dissent in part.
 
 
 
 Notes:
 
 
 [1]
 Although the majority now formally limits itself to holding that it is unconstitutional to recite the Pledge in public classrooms, its message that something is constitutionally infirm about the Pledge itself abides and remains a clear and present danger to all similar public expressions of reverence. At the very least, it deprives children in public schools of the benefits derived from those expressions
 
 
 [2]
 See, e.g., Lee v. Weisman, 505 U.S. 577, 632-35, 112 S.Ct. 2649, 2679-80, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting).
 
 
 [3]
 The citations to the four preceding Supreme Court opinions are to majority opinions, concurring opinions, and dissents. Because my point is that a number of Justices have recognized the lack of danger and because I hope to avoid untoward complication in the setting out of the citations, I have not designated which Justices have joined in which opinion. All in all, however, perusing those opinions indicates that Chief Justice Burger, Chief Justice Rehnquist, and Justices Harlan, Brennan, White, Goldberg, Marshall, Blackmun, Powell, Stevens, O'Connor, Scalia, and Kennedy have so recognized
 
 
 [4]
 They have not led us down the long path to kulturkampf or worse. Those who are somehow beset by residual doubts and fears should find comfort in the reflection that no baleful religious effects have been generated by the existence of similar references to a deity throughout our history. More specifically, it is difficult to detect any signs of incipient theocracy springing up since the Pledge was amended in 1954
 
 
 [5]
 See also Sherman, 980 F.2d at 448 (Manion, J., concurring) ("A civic reference to God does not become permissible ... only when... it is sapped of religious significance." The Pledge is constitutional and "[w]e need not drain the meaning from the reference [to God] to reach this conclusion.")
 
 
 [6]
 We, by the way, indicated as much inAmerican Family Ass'n, Inc. v. City and County of San Francisco, 277 F.3d 1114, 1125-26 (9th Cir. 2002), which involved governmental conduct that was much more questionable than adoption of the phrase "under God." See id. at 1126-28 (Noonan, J., dissenting).
 
 
 [7]
 I recognize that the Pledge did not then contain the phrase "under God."
 
 
 [8]
 Nor will we be able to stray into the fourth stanza of "My Country `Tis of Thee" for that matter
 
 
 [9]
 Lest I be misunderstood, I must emphasize that to decide this case it is not necessary to say, and I do not say, that there is such a thing as a de minimis constitutional violation. What I do say is that the de minimis tendency of the Pledge to establish a religion or to interfere with its free exercise is no constitutional violation at all. By the way, I am not the first to apply the de minimis concept to this area of the lawSee, e.g., Mitchell v. Helms, 530 U.S. 793, 861, 120 S.Ct. 2530, 2569, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring) (evidence of improper use of funds was de minimis and did not affect constitutional inquiry); Lee v. Weisman, 505 U.S. 577, 630-31, 112 S.Ct. 2649, 2678, 120 L.Ed.2d 467 (1992) (Souter, J. concurring) (establishment case; Madison recognized there is a difference between trivial and serious in constitutional practice, and pointed to the legal aphorism de minimis); Lynch v. Donnelly, 465 U.S. 668, 678, 104 S.Ct. 1355, 1361-62, 79 L.Ed.2d 604 (1984) (not all government conduct which gives special recognition to religion is unconstitutional; where the benefit is indirect or remote, it is not unconstitutional); School District of Abington v. Schempp, 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldburg, J., concurring) ("the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."); Rapier v. Harris, 172 F.3d 999, 1006 n. 4 (7th Cir.1999) ("De minimis burdens on free exercise are not of constitutional dimension"); Van Zandt v. Thompson, 839 F.2d 1215, 1222 (7th Cir.1988) (legislative prayer room would have a de minimis effect on advancement of religion); Walsh v. La. High Sch. Athletic Ass'n, 616 F.2d 152, 158 (5th Cir.1980) (de minimis burden on free exercise results in rejection of First Amendment challenge); Marsa v. Wernik, 86 N.J. 232, 430 A.2d 888, 899 (1981) (in an establishment case where impact of practice de minimis, it is unobjectionable); see also Peck v. Upshur County Bd. of Educ., 155 F.3d 274, 288-89 (4th Cir.1998) (if a genuine threat of establishing religion becomes apparent, it is soon enough to address the issue).